IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 10, 2013 Session

# IN RE J.R.P.

**Appeal from the Juvenile Court of Rutherford County**
**No. TC1696T   Donna Scott-Davenport, Judge**

**No. M2012-02403-COA-R3-JV - Filed August 19, 2013**

This is a parental termination case.  The appellant mother bore the child at issue when she was only 13 years old.  After the mother turned 18, she was turned out of her mother's home and moved often.  At that point, the Tennessee Department of Children's Services intervened and the child was eventually placed in foster care.  Months later, DCS filed the instant petition to terminate the mother's parental rights.  In the ensuing bench trial, the proof showed that, during an interim between nonconsecutive trial days, the child was removed from his long-term foster placement and placed with a new foster family.  The trial court found several grounds for termination and that termination of the mother's parental rights was in the child's best interest.  The mother now appeals only the best interest determination. We reverse, on the basis that the record does not contain clear and convincing evidence that termination of the mother's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J. W.S., and DAVID R. FARMER, J., joined.

Mark J. Downton, Nashville, Tennessee, for Respondent/Appellant S.T.P.

Robert E. Cooper, Jr. and Alexander S. Rieger, Nashville, Tennessee, for Petitioner/Appellee State of Tennessee Department of Children's Services

## OPINION

### FACTS AND PROCEEDINGS BELOW

In December 2004, Respondent/Appellant S.T.P. ("Mother"), then thirteen years old, gave birth to the child at issue in this appeal, J.R.P. ("Son").[1] Son was born with birth defects; he remains a special-needs child. The child has undergone surgery related to his birth defect and, at the time of trial, wore leg braces. He is expected in the future to undergo additional surgery.

In 2007, Mother had another child, a daughter ("Daughter"), who is not at issue in this appeal. While Mother was still a minor, Mother's mother, the child's maternal grandmother, allowed Mother and the two children to live with her. During this time, Mother completed the child care and parenting classes offered by her high school, and she graduated from high school in 2010. For reasons that do not appear in the record, when Mother turned eighteen and graduated from high school, Mother's mother turned out both Mother and the children and refused to permit them to live with her any longer.

When Mother was forced to leave her mother's home, she sent Daughter to live with Daughter's paternal grandparents. Mother and Son moved in with a family friend.

In August 2010, the Tennessee Department of Children's Services ("DCS") received a referral against Mother, alleging environmental neglect of Son. DCS investigated the complaint and interviewed Mother about concerns that her housing situation was unstable. At that time, the family friend with whom Mother and Son were living told DCS that she was committed to supporting Mother and Son indefinitely.

That situation soon changed. By the end of August, Mother's housing situation became unstable and DCS received additional calls about Son. The record indicates that the family friend who had housed Mother and Son no longer wished to have them living with her. Daughter's paternal grandparents remained committed to caring for Daughter, but felt that their home could not accommodate the addition of Mother and Son. This left Mother unable to provide shelter for Son and unable to care for the child's special needs. As a result, in September 2010, DCS filed a petition in the Juvenile Court of Rutherford County, Tennessee to declare Son dependent and neglected. In October 2010, the Juvenile Court entered an order declaring Son to be dependent and neglected.

---

[1] The child was conceived as a result of the rape of Mother. The record does not indicate the identity of the biological father or his whereabouts.

DCS agreed to place Son with a different family friend. It staffed a permanency plan that required Mother to obtain and maintain stable housing and to cooperate with Son's medical providers and other service providers. Subsequent permanency plans also required Mother to demonstrate that she had sufficient income to care for Son, attend regular mental health counseling, and take her prescribed medication.

Son's placement remained the same for a couple of months, until tension developed between Mother and the family friend who had physical custody of Son. Mother came to believe that the friend was not properly caring for Son's medical needs, and the tension devolved into outright hostility between the two. In mid-December 2010, with Mother's agreement, the Juvenile Court entered an order allowing DCS to take the child into protective custody. At that point, Mother had not yet resolved any of the issues that initially led DCS to remove the child from her custody, and in particular had not yet obtained stable housing. Therefore, in late December 2010, Son was placed in a foster home. At that time, the Juvenile Court also appointed a guardian ad litem and ordered Mother to pay $25 in child support per month.[2]

The Juvenile Court entered an order in April 2011, providing that Mother could have four hours per month of visitation with Son; it stated that the visitation was to be supervised.[3] Mother was apparently allowed daily phone calls with the child. Mother's visits were not scheduled in advance; instead, the week Mother wanted a visit she would call or text the DCS representative to request a visit based on when she would have transportation, and if possible the visit would then be arranged to accommodate Mother.

Over the next several months, Mother exercised some of the visitation allocated to her, but not all; she ended up seeing Son approximately once a month. At first, Son apparently cried and became upset when his visits with Mother would end. Over time, however, Son stopped crying when the visits ended and even began wanting them to end early. Nevertheless, Mother spoke to the child on the telephone quite often.[4]

---

[2]For reasons that do not appear in the record, there was a delay in the entry of the trial court's written order requiring Mother to pay child support. As a result, there were problems with Mother's first few attempts to pay child support because the child support office had no order on file and did not have the children's social security numbers in the system. Therefore, Mother's first several payments were returned to her. She deposited these returned checks into a bank account, but the money disappeared from the account without explanation. Once the trial court's child support order was entered, Mother's child support payments were garnished from her wages. In the trial below on the petition to terminate, there was no explanation for the money that allegedly disappeared from Mother's bank account.

[3]The record does not indicate why the trial court required Mother's visits with the child to be supervised.

[4]Mother complained repeatedly that the foster parents often did not make the child available for her
(continued...)

Son remained in this foster family for over a year.[5] At one point, the foster parents indicated that they hoped to adopt him.

In March 2012, DCS filed the instant petition in the Juvenile Court, asking the Juvenile Court to terminate Mother's parental rights as to Son.[6] The petition alleged several grounds for termination: abandonment by failure to visit and failure to support, abandonment by failure to provide suitable home, persistent conditions, and substantial noncompliance with the permanency plan.[7] The petition asserted that Mother had failed to make lasting changes in either her conduct or her circumstances to make it safe for the child to return to her custody, and alleged that Mother and Son had no meaningful relationship, so termination was in the child's best interest. Mother was appointed counsel to represent her in the termination proceedings.

The Juvenile Court conducted a bench trial on the DCS petition to terminate over two nonconsecutive days, on June 14, 2012 and July 3, 2012. The trial was not bifurcated, so the trial court heard evidence on grounds and best interest at once. By the time of trial, Mother had maintained stable employment for approximately four months working at McDonald's restaurant, was paying monthly child support, and was attending school at night.[8] However, at the time of trial, Mother was living with her boyfriend and had not secured housing of her own.[9] The trial court heard testimony from several DCS representatives and from Mother.

---

[4](...continued)
scheduled telephone visitation. Mother reported her concerns to the DCS resource coordinator for the family. It appears that DCS discussed Mother's concerns at team meetings, but took no immediate action.

[5]At various times, Mother was critical of the care these foster parents gave to Son. She understood from Son that the parents utilized corporal punishment in the home, felt that Son's clothes were often dirty or seasonally inappropriate, and believed that the foster parents often put on the child's leg braces and shoes incorrectly. The DCS representative, however, characterized Son's interaction with this foster family as "very positive." After being told by Mother that Son had reported that he "got a whipping" by the foster parents, DCS spoke to the child; he recanted the allegations so DCS took no further action at that time.

[6]The petition sought to terminate Mother's parental rights only as to Son, not Daughter.

[7]Tenn. Code Ann. §§ 36-1-113(g)(1)-(3); 36-1-102(1)(A)(i)-(iii).

[8]In the months preceding the filing of DCS's petition to terminate, prior to working for McDonald's, Mother worked for a temporary agency in a variety of jobs.

[9]The record does not contain any information regarding the living conditions at the home of Mother's boyfriend.

In the first segment of the trial in June 2012, the trial court heard the testimony of the DCS case worker from Life Care and Family Services assigned to the family, Michelle Dennis. Ms. Dennis explained that she had worked with Mother for approximately three years, beginning when Mother was in high school and living with her mother. At that point, Son was not in DCS protective custody; Ms. Dennis was working with Mother because of the instability in the home of Mother's mother. Ms. Dennis testified that she saw Mother "most definitely once a week, sometimes . . . twice a week." During the time she spent with Mother, Ms. Dennis said, they had worked on things such as educational goal-setting, budgeting, parenting, anger management, boundaries, and improving communication skills. Ms. Dennis thought that Mother could benefit from additional counseling, but observed overall that "from when I first started working with [Mother] to now, she has walked milestones. She's totally did a 360, so a lot of – a vast amount of improvement." Ms. Dennis described Mother as "cooperative" and "receptive," and said that Mother pays attention to instruction and does her best to follow through. She added that Mother at times became overwhelmed by the obstacles before her.

Ms. Dennis outlined the priorities for Mother in accomplishing the goals in the DCS permanency plan. She said that the first concern was employment, so that Mother could maintain housing and have income to pay bills. Ms. Dennis helped Mother apply for work at a variety of places and assisted her in following up with potential employers. Ms. Dennis also worked with Mother in setting a budget. Mother's attempts to budget were frustrated by needy family members, so they also worked on setting boundaries with loved ones. Ms. Dennis noted that Mother had never had a driver's license, but chose not to focus on helping Mother obtain a driver's license because Mother did not have a vehicle to drive.

During this time, Ms. Dennis testified, Mother was constantly moving from home to home. Ms. Dennis estimated that Mother had lived in approximately five places, all of which were in someone else's name. At the time of trial, Mother had an application on file for subsidized housing in which Mother's rent would be based on her income level. Ms. Dennis was confident at trial that Mother would receive a subsidized apartment when one became available; she expected Mother's application to be processed in the next couple of months.

Ms. Dennis said that she had worked with Mother on her parenting skills and anger management. She said that Mother had made progress in both, but still had room for improvement, particularly in anger management. Ms. Dennis indicated that Mother would benefit from additional counseling, and that she intended to continue to work with her regardless of the outcome of the termination proceedings.

The trial court next heard testimony from Mother. Since February 2012, Mother said, she had worked at McDonald's restaurant for $7.50 per hour, approximately 35-40 hours a week.

Mother said she had asked the McDonald's managers to schedule her as many work hours as possible, to enable her to get an apartment. At the time of trial, Mother was living with her boyfriend; Mother said that she was paying him $300 per month in rent. She noted that she is dependent on him and her co-workers to get to and from work and school because she does not know how to drive, has never had a driver's license, and does not own a car. Despite moving several times, Mother said she had never been without a place to stay since leaving her mother's home in August 2010.

Mother acknowledged in her testimony that she was to pay $25 per month in child support for Son. Since she began working at McDonald's, Mother said, her child support payments were removed from her paycheck each month. In that way, she had paid child support every month.

Mother acknowledged that she had not taken advantage of all the visitation with Son she was allowed under the trial court's order. She said that her failure to use all of her visitation was due primarily to a lack of financial resources. Mother explained that she thought it was important for her to provide Son with snacks and activities at their visits, because it was her job as his mother and because Son had come to expect it. Mother noted that she was not receiving any food stamps or government assistance and said she did not have enough money to provide Son with the snacks and activities he expected at their visits.[10]

Mother was asked whether she thought her bond with Son had diminished over time, in view of the fact that Son initially would cry at the conclusion of their visits and over time stopped crying at the end of the visits and even wanted to end the visits sooner than scheduled. Mother responded by saying that she did not think that bond between them had diminished in any way. She thought it was a good thing that Son no longer cried at the end of their visits; she viewed it as him being strong. No matter how long their visits are, Mother said, they "have good conversation" and "still have a laugh at anything."

Mother noted that she frequently attended Son's medical appointments, as often as possible when she got notice of them, although technically her attendance at these appointments was not classified as "visiting" with the child for purposes of the permanency plan. Mother said she also had a telephone call with Son nearly every day since he was taken into DCS protective custody. She said that, with the exception of approximately five times when her phone was shut off for financial reasons, she had made those calls to Son every night at 7:00 p.m., unless her work schedule interfered, in which case she would reschedule the call. Mother voiced frustration that Son's foster parents sometimes did not make the child available at the scheduled time.

---

[10]The only government assistance she received, Mother said, was TennCare.

Overall, Mother believed she had made good progress and felt that things would fall into place if she were given a bit more time to get the subsidized apartment for which she had applied. Asked why termination of her parental rights was not in Son's best interest, Mother responded:

> I mean, that's my child. I brought him into this world. I mean, I should be able – I mean, I should be the one to raise him and not somebody else. It should be me who– you know, he's used to seeing me when he goes to sleep and when he wakes up. He's seeing me playing this – we go outside and we play. It's just – it used to be me and him, and now he's with somebody else and he tells me on occasion he wants to come home, and all I can do is tell him I'm trying my hardest to get him home.

The trial court heard testimony from another DCS witness, Beth Pitsinos, an Omni Vision resource coordinator who was tasked with supervising Son's foster home and Son's visits with Mother. Describing the visits, Ms. Pitsinos said that Mother always gave her full attention to Son, talking and interacting with him during the entire visit. She noted that Mother was always conscientious about providing food, snacks, and activities for Son during their visits. The location for the visits was chosen by Mother; they consisted of things like picnics in the park and trips to the mall or to a bookstore. In early visits, Ms. Pitsinos said, Son would begin to cry as soon as she mentioned getting ready to leave Mother; she said that Son "would cry the whole way home." As time wore on, Ms. Pitsinos testified, Son remained excited and happy to go to the visits with Mother, but began wanting to leave the visits early to return to school or aftercare.

Ms. Pitsinos testified that she had no "negative experiences" with Mother during her visits with Son, the only problem was that Mother did not take advantage of all the visitation she was permitted to have. Mother was allotted four hours per month with Son, and Ms. Pitsinos estimated that the typical visits were about an hour long, once a month. Ms. Pitsinos explained that Mother had not missed scheduled visits; rather, Mother was often unable to schedule visits for lack of transportation and occasionally for lack of telephone service. Ms. Pitsinos believed that the inconsistency of visitation and short length of the visits contributed to the weakening of the bond between Mother and Son. Ms. Pitsinos' testimony concluded the first day of the trial.

The trial resumed on July 3rd. At the outset, the trial court heard testimony from DCS family service worker Ebony Pass Lott about the significant changes in Son's living situation that had occurred since the first day of trial. Less than a week before resumption of the trial, Ms. Pass Lott explained, DCS held a team meeting about Son to discuss the results of an investigation into Son's foster placement. At the meeting, she said, DCS decided that it was

no longer in Son's best interest to remain in the foster home in which he had been residing for approximately 18 months. Questions from Mother's counsel to Ms. Pass Lott on the reasons for the DCS decision to remove Son from his foster home were met with objections that were sustained by the trial court.[11] Ms. Pass Lott testified that Son had been moved to a new foster home. The new foster home was characterized as a "pre-adoptive home," even though Ms. Pass Lott said that the new foster family would not be eligible to adopt Son until the child had lived in the home for a least six months. Ms. Pass Lott offered no testimony on Son's situation in the new foster home.

Ms. Pass Lott described Son as "[s]weet, very kind, lovable, energetic." She said that the child was still being treated for birth defects; the treatment required him to wear leg braces. Not long before the trial, Ms. Pass Lott said, Son underwent elective surgery related to his birth defect. The surgery was described as not "medically necessary," but "medically indicated." Mother was initially hesitant about Son undergoing the corrective surgery because the child had told her that he was scared and did not want it. Eventually, however, Mother agreed that the child should undergo the surgery.

Similar to Ms. Pitsinos' testimony, Ms. Pass Lott said that the reason Mother did not exercise all of her allotted visitation centered on Mother's work schedule, lack of monetary resources, and transportation issues. Although Ms. Pitsinos observed most of Mother's visits with son, Ms. Pass Lott said that she supervised a few of Mother's visits. Generally speaking, Ms. Pass Lott said, Mother "was happy to see [Son] and he was happy to see her."[12] This concluded the testimony at trial.

At the conclusion of the trial, the trial court rendered on oral ruling holding that grounds were established and that termination of Mother's parental rights was in Son's best interest. In September 2012, the trial court entered a lengthy 31-page written order with findings of

---

[11]The State objected to questions by Mother's counsel on the reasons for changing the child's placement, arguing that it was not pertinent to either grounds or the child's best interest. We are puzzled at the trial court's exclusion of this testimony. It is often important for the trial court to have evidence of how the child is doing while not in his parent's custody, to make an informed decision on whether the child's best interests are served by terminating the parental relationship. Here, testimony on how the child fared in his previous foster placement, the reasons for the change in foster placement, and how the child was doing in his new foster home, would all be relevant to whether terminating Mother's parental rights is in the child's best interest.

[12]Ms. Pass Lott seemed to disagree with Ms. Dennis's assessment that, with further counseling and services, Mother's compliance with the permanency plan goals would improve. There were numerous objections to the questions put to Ms. Pass Lott on this issue, however, and repeated attempts to rephrase the question to meet the objections resulted in a query so confusing that Ms. Pass Lott's response is not useful to the Court.

fact and conclusions of law, explaining the reasoning for the court's decision and incorporating much of the trial court's oral ruling.

In the order, the trial court first found that all five grounds for termination alleged by DCS had been established by clear and convincing evidence. The order included factual findings as to each ground.

The order then addressed whether terminating Mother's parental rights was in Son's best interest. In the order, the trial judge acknowledged "really struggling" with the best interest determination. The trial court acknowledged the strides that Mother had made in overcoming her many obstacles, and especially noted Mother's accomplishment in graduating from high school, given her circumstances. For all that, the trial judge stated that she "wonder[ed] why couldn't that person (Mother) that did all that back then get the necessary things done in this matter to be reunified with her Child, because the Court believes [that] Mother has the ability."

The trial court expressed considerable disappointment in how Son's foster care was handled. Referencing the testimony of Ms. Pass Lott, the trial court observed: "It is a pre-adoptive home, and the Court hopes that it's going to be a permanent home for [Son], but in this crazy world we call Juvenile Court, we don't have our crystal balls, but the Court has to go and look to the law and do what the law requires and dictates the Court should do as mandated by said law." The trial court then made the following findings of fact:

> We are directed by statute to not tear up families but reunify, but at the same time, we've got this law that says if Parents don't do what the law dictates that foster care is temporary, and it is the alpha and omega that we have permanency for our Children and the question is "is it in the best interest to terminate?", and [DCS's counsel] I believe is correct, it is [in] the best interest to terminate and it achieves and furthers the goal of achieving permanency. Therefore the Court makes the following findings in fact as to best interest as it is dictated by statute to do:
>
> 48. Finding in fact one, that I've just found by clear and convincing evidence as to the permanency plans, persistence of conditions and substantial non-compliance that it would be in the best interest to terminate because Mom has made no adjustment of her circumstance, her conduct or conditions as we sit here today to make it safe for her son to return home to her.
>
> 49. Finding in fact next, that she has not made a lasting adjustment after 22 months of reasonable efforts by the State, and all I'm hearing is, we might

have housing in two months and we do have a job, and we have heard from Mother that she should be able to secure housing in a couple of months through Spring Valley, but unfortunately there is no guarantee of that and the Court must look at where we are today and Mother is still without appropriate and safe housing for [Son].

50. Finding in fact next, that Mother hasn't visited regularly. It's just the opposite. During the four (4) months preceding the filing of the State's Petition Mother only exercised less than 20% . . . of the visitation time that . . . was allowed.

51. Finding in fact next, that the Court must ask "do we have a meaningful parent/child relationship between Mom and [Son]?" The Court finds that we have a relationship of Mom and son, but the statute says a meaningful relationship, and the Court finds there is not a meaningful relationship due to Mother's failure to visit on a regular basis and as such Mother has created this barrier to reunification.

52. I don't think I can give the best interest factor of the effect of change in caretakers to either party because [Son's] placement was changed less than a week ago, but the Court also finds that changing placement again either to another foster home or back to the Mother's home would be very harmful to this Child. The Court has heard that the current placement is a pre-adoptive home, but the Court cannot give any weight to any kind of bond with the foster parents and it can not give weight as to whether or not they are willing, able, and capable of adopting, due to the Child just recently being placed in their home.

53. So the Court determines best interests by weighing all of the statutory factors and again the Court notes it cannot delay permanency and on behalf of the Mother it breaks the Court's heart, really, to make this ruling today, but based upon the evidence presented, the statutory requirements and the mandate to achieve permanency the Court must find that it is in the best interest to terminate Mother's Parental Rights, because I've got to have permanency for [Son] and the Court is just sorry Mother couldn't do it quicker before 22 months of DCS involvement, including 18 months of foster care. Therefore the Court finds it is in the best interest of [Son] to terminate Mother's [p]arental rights and grant full and complete guardianship to DCS, State of Tennessee, finding the same in fact and by conclusion of law, by clear and convincing evidence.

Thus, in making its best interest determination, the trial court relied on the fact that Mother had not yet improved her situation sufficiently to regain custody of Son, that she did not visit with the child as often as allowed, and that the bond between Mother and Son was not sufficiently strong. The trial court gave no weight to the child's bond with his foster family at the time of the trial court's decision. Weighing these factors, the trial court held that termination of Mother's parental rights was in Son's best interest. Mother now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother challenges the Juvenile Court's holding that termination of her parental rights was in Son's best interest.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1)(2012). Second, the party who seeks termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K. B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *21 (Tenn. Ct. App. Oct.7, 2011). The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

Evidence that meets the clear and convincing evidence standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Askia K. B.*, 2011 WL 4634241, at *7, 2011 Tenn. App. LEXIS 549, at *20; *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *13-14 (Tenn. Ct. App. Jan.10, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9; 2003 Tenn. App. LEXIS 569, at *26 (Tenn. Ct. App. Aug.13, 2003)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable than not.' " *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

Because of the clear and convincing evidence burden of proof in parental termination cases, appellate courts adapt the customary standard of review set forth in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, the trial court's specific factual findings must be reviewed *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Tiffany B.*, 228 S.W.3d at 156; Tenn. R. App. P. 13(d)(2012). When the trial court's factual finding is based on the assessment of a witness's credibility, this Court will afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Second, the appellate court must decide whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *In re Audrey S.*, 182 S.W.3d at 861; *In re Askia K. B.*, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *22. The trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *See In re the Adoption of A.M.H.*, 215 S.W.3d at 809; *In re Tiffany B.*, 228 S.W.3d at 156.

**ANALYSIS**

A biological parent's right to the care and the custody of her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65; 120 S. Ct. 2054, 2060 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d at 809; *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *In re Giorgianna H.*, 205 S.W.3d at 515 (citing *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope,* 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d at 653.

As noted above, Tennessee statutes require the party who seeks to terminate the parental rights of a biological parent to prove by clear and convincing evidence both the grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). In this appeal, Mother does not challenge the trial court's findings on grounds, but appeals only the trial court's finding that termination of her parental rights is in Son's best interest.

A finding of grounds to terminate the parental rights of a biological parent does not automatically mean that termination is in the child's best interest. *Dept. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 201 (Tenn. Ct. App. 2006). In considering a petition to

terminate parental rights, the court is called to make a separate determination of a child's best interest viewed from the perspective of the child, not the parent. ***In re Audrey S.***, 182 S.W.3d at 878. Ascertaining the child's best interests in a termination proceeding is a fact-intensive inquiry. ***Id.*** The court must weigh the evidence in light of several statutory factors set forth in Tennessee Code Annotated § 36-1-113(i),[13] as well as any other relevant factors, to determine whether irrevocably severing the relationship between parent and child is in the child's best interest. ***In re Giorgianna H.***, 205 S.W.3d at 523. The burden of proving by clear and convincing evidence that termination of Mother's parental rights is in Son's best interest falls on the party seeking termination, here, DCS. ***In re Arteria H.***, 326 S.W.3d 167, 175 (Tenn. Ct. App. 2010); Tenn. Code Ann. § 36-1-113(c).

---

[13]Under Tennessee Code Annotated § 36-1-113(i), the factors examined in order to determine whether termination is in the children's best interests are:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (2012).

Neither the trial court nor this Court is required to apply each factor in the best interest determination. ***In re M.A.R.,*** 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The relevancy and weight given to each factor depends on the unique facts in each case. ***In re Marr***, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).

In this case, the trial court clearly struggled with its decision to terminate Mother's parental rights as to Son. It recognized that Mother had faced daunting hurdles and had made tremendous progress. The trial court rightly emphasized the importance of achieving permanency for children in foster care, as reflected in Tennessee's termination statutes. As Mother had had significant time to erase the obstacles to returning the child to her custody and had not yet reached the mark, the trial court appeared to reason, it was in Son's best interest to sever the child's relationship with his mother.

Under the facts of this case, we must respectfully disagree. The record is devoid of any evidence that the relationship between Mother and Son is detrimental to the child in any way. Remarkably, given her history, the record shows that Mother has no criminal history and has never had any drug, alcohol, or physical abuse issues. Mother's dogged determination to overcome the odds against her provide a powerful role model for a child with many obstacles of his own.

The trial court characterized Mother's visitation with Son as "token." The record indicates that, although the maximum amount of visitation was not exercised, the visits were regular, appropriate, and positive in tone, and were supported by Mother's frequent telephone calls. While the parental bond has clearly suffered from the long period of time in which Son has been in foster care, the evidence indicates that the relationship is affectionate and far from non-existent.

Mother's continued efforts to participate in Son's medical care are significant in this case. As a special-needs child, Son's medical problems remain substantial. Mother's attendance at the child's medical appointments, her participation in medical decisionmaking, and her attention to whether foster parents are tending to the child's medical needs are crucial. Decisions such as whether the child should undergo corrective surgery are best made in consultation with a responsible loving adult who knows the child's history, medical and otherwise. The record indicates no such person in Son's life, other than Mother.

Given the upheaval in Son's foster placement, the record does not show that termination of Mother's parental rights furthers the goal of achieving permanency for the child. At the time of the second segment of the trial, Son had been in his new foster home only a *few days.* For DCS to describe such a foster placement as "pre-adoptive" is simply eyewash. In this record, it appears that Mother is in fact the only consistent adult presence in Son's life.

We recognize, as did the trial court, that Mother was in no position at the time of trial to take custody of Son. That fact should not be minimized. However, a decision not to grant a petition to terminate parental rights does not mean that custody of the child is returned to the

-14-

respondent parent. The issue before us is confined to whether, under the circumstances of this case, it is in the child's best interest to completely terminate the parent-child relationship.

"No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re M.J.B.*, 140 S.W.3d at 653 (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996)). We must respectfully conclude that DCS failed to establish by clear and convincing evidence that termination of Mother's parental rights is in Son's best interest. *In re Madilene G.R.,* No. M2012-01178-COA-R3-PT, 2013 WL 139564, at *14 (Tenn. Ct. App. Jan. 10, 2013) (citing *In re Audrey S.*, 182 S.W.3d at 860). Therefore, the Juvenile Court's decision to terminate Mother's parental rights must be reversed.

## CONCLUSION

The decision of the juvenile court is reversed. Costs on appeal are assessed against Petitioner/Appellee State of Tennessee Department for Children's Services, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE